

**FILED**

AUG 2 8 2009

DAVID CREWS, CLERK
BY _____ Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**THE STATE OF MISSISSIPPI**                                                    **PLAINTIFF**

**VS.**

**SANOFI-AVENTIS f/k/a/ AVENTIS**                    CIVIL ACTION NO. 3:09CV090—M—A
**PHARMACEUTICALS, INC.;**
**HOECHST MARION ROUSSEL;**
**DERMIK LABORATORIES, INC.;**
**AVENTIS BEHRING, L.L.C.;**
**ZLB BEHRING, L.L.C; and**
**CSL BEHRING, L.L.C.,**                                                        **DEFENDANTS**

---

### NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Hoechst Marion Roussel, Inc. (predecessor to Aventis Pharmaceuticals Inc.), Dermik Laboratories, Inc., CSL Behring, LLC, ZLB Behring, LLC and Aventis Behring LLC (collectively, the "Defendants") hereby remove this action from the Circuit Court of Lafayette County, Mississippi, to the United States District Court for the Northern District of Mississippi, Western Division. All properly named and served defendants consent to this removal.[1] This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states. The bases for removal are set forth in detail below.

---

[1] Plaintiff also named but has not served "Sanofi-Aventis f/k/a/ Aventis Pharmaceuticals, Inc." as a defendant. There is no legal entity in the U.S. named "Sanofi-Aventis." Aventis Pharmaceuticals Inc. is a successor to Hoechst Marion Roussel, and still exists as a legal entity. Although Plaintiff has not served Aventis Pharmaceuticals Inc., to the extent Plaintiff intended to name Aventis Pharmaceuticals Inc. that corporation waives service and joins in this removal. Further, Dermik Laboratories, Inc. is no longer a corporation, nor is it a legal entity of any type. Finally, ZLB Behring, LLC and Aventis Behring, LLC are corporate predecessors of CSL Behring, LLC.

## I.  INTRODUCTION

1.      On July 27, 2009, the Mississippi Attorney General filed a Complaint in the Circuit Court of Lafayette County, Mississippi, against Defendants.  The Complaint alleges that Defendants engaged in deceptive acts in the pricing and marketing of their prescription drugs, and that this caused the State and School Employees' Life and Health Insurance Plan ("the Health Insurance Plan") to pay excessive reimbursements to medical providers, such as pharmacists. (See Compl. ¶1, attached in composite Exhibit A which is composed of all process, pleadings, and orders served to date upon the parties.)

2.      The Health Insurance Plan is a self-insured health insurance plan which pays for the claims and expenses associated with providing state employees, retirees, and their dependents with health care coverage.  (Compl. ¶17.)  All costs are paid from the money collected in premiums.  (State and School Employees' Life and Health Plan, Plan Document, Revised January 2009 ("Plan Document') at 3; *see also* 09-060-001 Miss. Code R. at 66 (Weil 2005), CMSR 09-060-001 at 55 (Lexis)).  There is no direct appropriation of funds to the Health Insurance Plan by the State of Mississippi. *Id.*

3.      The Complaint asserts claims of False Advertising, Crimes Against Sovereignty, Intentional Misrepresentation, Negligent Misrepresentation, Tortious Interference with a Business Relationship, Common Law Fraud and Unjust Enrichment.  (Compl. ¶¶ 61-99.)  The action was captioned *State of Mississippi v. Sanofi-Aventis, et. al.*, Civil Action No. L09-460.

## II.  NOTICE OF REMOVAL IS TIMELY

4.      CSL Behring, LLC was served with Plaintiff's Complaint on July 30, 2009. Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is timely filed within 30 days after

- 2 -

service of process on the first properly joined defendant. *See Getty Oil v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1262-63 (5th Cir. 1988).

### III.    THIS COURT HAS DIVERSITY JURISDICTION

5.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between plaintiff and each defendant, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.   Removal is therefore appropriate under 28 U.S.C. § 1441.

**A.     The Diversity of Citizenship Requirement is Satisfied.**

6.     The real party in interest in this action, the Health Insurance Plan, is a citizen of the State of Mississippi.   Although the Mississippi Attorney General listed the "State of Mississippi" as plaintiff in the Complaint, the State is a nominal party, at best.   Therefore, the Court must disregard the State's citizenship for diversity purposes.

7.     Defendant Hoechst Marion Roussel, Inc. was formerly a Delaware corporation with its principal place of business in Missouri.   Aventis Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in New Jersey.   Defendant Dermik Laboratories, Inc. was formerly a Delaware corporation with its principal place of business in Pennsylvania. Defendant CSL Behring, LLC is a Delaware limited liability company with its principal place of business in Pennsylvania.   Defendants Aventis Behring, LLC and ZLB Behring, LLC are corporate predecessors of CSL Behring, LLC and were Delaware limited liability companies with their principal place of business in Pennsylvania.[2]

8.     In determining diversity jurisdiction, a federal court "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."

---

[2]     Aventis Pharmaceuticals Inc. has not been properly served in this action.   It is a Delaware corporation with its principal place of business in New Jersey.

- 3 -

*Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (U.S. 1980). The Court must look beyond the plaintiff's pleadings and choice of named parties to determine whether diversity jurisdiction exists. *Eikel v. States Marine Lines, Inc.*, 473 F.2d 959, 963 (5th Cir. 1973). Where a state is a named plaintiff but the state is merely a nominal party, the citizenship of the state must be disregarded. *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418 (5th Cir. 2008).

9.     The Complaint, Mississippi statutes, and the Plan Document make it clear that the Health Insurance Plan is the real party in interest to this controversy. Like a private insurance company, the Health Insurance Plan is self-funded and "[a]ll costs are paid from the money collected in premiums." Plan Document at 3; *see also* 09-060-001 Miss. Code R. at 66 (Weil 2005), CMSR 09-060-001 at 55 (Lexis). "There is no direct State appropriation of funds to the Plan." *Id.* The Health Insurance Plan is the only entity that has allegedly been damaged, not the State of Mississippi.

10.     In suits involving a state agency, such as the Health Insurance Plan, where the state agency is a "sufficiently separate entity" from the state and not merely an alter ego of the state, the state agency is the citizen for diversity purposes rather than the state. *C.H. Leavell & Co. v. Board of Comm'rs*, 424 F.2d 764, 767 (5th Cir. 1970). The same is true in this case. The Health Insurance Plan operates as a "separate entity" from the state. It is governed by a Management Board that "has complete authority to control, operate, and manage the Plan." Plan Document at 1; *see also* 09-060-001 Miss. Code R. at 1 (Weil 2005), CMSR 09-060-001 at 5 (Lexis).

11.     Major decisions are made by the Management Board, not the state legislature or the governor. By statute, the board has "the sole authority to promulgate rules and regulations governing the operations of the insurance plans and shall be vested with all legal authority

- 4 -

necessary and proper to perform this function." Miss. Code § 25-15-303(3). The Management Board is given broad discretion to "design a plan of health insurance for state employees" that includes "incidental coverages that the board deems necessary" and "major medical benefits in such amounts as the board determines." Miss. Code 25-15-9(1)(a) Further, "the board is also authorized to accept bids for such alternate coverage and optional benefits as the board deems proper." *Id.*

12.     Additionally, diversity jurisdiction is supported where a state agency is "invested with the power to sue and be sued, and possesses other generally recognized corporate powers." *Department of Health & Rehabilitative Services v. Davis,* 616 F.2d 828, 833 (5th Cir. 1980). The Management Board enjoys these powers. The board is "authorized to procure legal services if it deems those services to be necessary to carry out its responsibilities" and can "enter into contracts with accountants, actuaries and other persons from the private sector whose skills are necessary to carry out [its] purposes . . . ." Miss. Code § 25-15-5(6)(d); Miss. Code § 25-15-5(6)(a). The Management Board can also be served with legal process. Plan Document at i.

13.     Lastly, like a private insurance company, the Management Board is authorized to determine the manner in which health insurance premiums are collected. The Health Insurance Plan's premiums are held in a separate account or fund. "These funds and interest earned on these funds may be used for the disbursement of claims and shall be exempt from the appropriation process." Miss. Code § 25-15-15(1). The Board has authority to draw on these funds in order to operate the Health Insurance Plan. However, if the funds are not needed, then "[a]ll funds in excess of the amount needed for disbursement of claims shall be deposited in a special fund," and all earnings from investments and interest are also credited to that fund. *Id.* at § 25-15-15(8).

3634532v6
JM DFM 736895 v1
2140222-000002 8/28/2009

14.     As shown above, the Health Insurance Plan is the real party in interest and not the State.  Because complete diversity exists between the Health Insurance Plan and each Defendant, removal to this Court is proper.

**B.     The Amount in Controversy Requirement is Satisfied.**

15.     The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

16.     The Complaint alleges that Defendants actions "impacted" the Health Insurance Plan "by causing it to pay grossly excessive reimbursement rates for Defendants' prescription drugs to medical and pharmaceutical providers." (Compl. ¶1)

17.     The Complaint seeks an unspecified amount of compensatory and punitive damages.  Although the amount of damages is not specifically pled, the amount in controversy is clearly in excess of the jurisdictional requirement as the Complaint alleges intentional misconduct and seeks both compensatory and punitive damages for the Health Insurance Plan's alleged injuries.  *See Montgomery v. First Family Fin. Servs., Inc.*, 239 F. Supp. 2d 600, 605 (S.D. Miss. 2002) (noting that federal courts in Mississippi have consistently held that a claim for an unspecified amount of punitive damages under Mississippi law is deemed to exceed the amount necessary for federal jurisdiction);  *Collins*, 2006 WL 2788564, at *2 (same).

## IV.     REMOVAL TO THIS DISTRICT IS PROPER

18.     Removal venue exists in the United States District Court for the Northern District of Mississippi, Western Division, because the Circuit Court of Lafayette County, Mississippi sits within this federal district and division.  *See* 28 U.S.C. § 104(a)(2).

19.     Pursuant to 28 U.S.C. § 446(a), copies of all process, pleadings, and orders served to date upon all the parties are attached hereto as Exhibit A.

- 6 -

20. This Notice of Removal will be promptly served on the attorneys for the Plaintiff, and a copy will be promptly filed with the Clerk of the Circuit Court of Lafayette County, Mississippi, pursuant to 28 U.S.C. § 1446(d).

21. Defendants reserve the right to amend or supplement this Notice of Removal.

WHEREFORE, Defendants pray that the above-entitled matter be removed to this Court from the Circuit Court of Lafayette County, Mississippi.

This the 28th day of August, 2009.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

By: _____
JESSE MITCHELL, III

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Walker W. Jones, III (MSB #3303)
David F. Maron (MSB #10170)
Cable W. Frost (MSB # 100757)
Jesse Mitchell, III (MSB # 103020)
P.O. Box 14167
Jackson, Mississippi 39236
Telephone: 601-351-2400
Facsimile: 601-351-2424

**ATTORNEYS FOR DEFENDANTS**

- 7 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August, 2009, a copy of the foregoing was hand-delivered to the following:

> **McCULLEY McCLUER PLLC**
> Stuart H. McCluer
> 1109 Van Buren Avenue
> Oxford, Mississippi 38655
>
> **DAVID SHELTON PLLC**
> David W. Shelton
> P.O. Box 2541
> 120-A Courthouse Square
> Oxford, Mississippi 38655

and sent by U.S. Mail, first-class, postage prepaid to:

> **RICHARDSON PATRICK WESTBROOK & BRICKMAN, LLC**
> James L. Ward, Jr.
> P.O. Box 1007
> Mt. Pleasant, SC 29465
>
> **ATTORNEY GENERAL OF MISSISSIPPI**
> Honorable Jim Hood, Attorney General
> George Neville, Special Assistant Attorney General
> P.O. Box 220
> Jackson, MS 39225

This the 28th day of August, 2009.

_____
Jesse Mitchell, III

- 8 -

# IN THE CIRCUIT COURT OF LAFAYETTE COUNTY, MISSISSIPPI

**THE STATE OF MISSISSIPPI,**              **PLAINTIFF,**

**V.**            CIVIL ACTION NO. L09-460

USDC/NDMS #3:09CV090-M-A

LAFAYETTE COUNTY

**SANOFI-AVENTIS f/k/a/ AVENTIS**
    **PHARMACEUTICALS, INC.;**
**HOECHST MARION ROUSSEL;**
**DERMIK LABORATORIES, INC.;**
**AVENTIS BEHRING, L.L.C.;**
**ZLB BEHRING, L.L.C; and**
**CSL BEHRING, L.L.C.,**                **DEFENDANTS.**

FILED

JUL 2 7 2009

Mary Alice Busby
CIRCUIT CLERK

BY_____ D.C.

---

## COMPLAINT

---

### <u>Jury Trial Demanded</u>

Plaintiff, the State of Mississippi, by and through its Attorney General (hereinafter "Mississippi") files this Complaint against the above-named Defendants and alleges, on information and belief, the following:

### <u>INTRODUCTION</u>

1.     Defendants have engaged in false, misleading, willful, unfair, and deceptive acts and practices in the pricing and marketing of their prescription drug products. Defendants' fraudulent pricing and marketing of their prescription drugs has impacted Mississippi's State and School Employees' Life and Health Insurance Plan ("the State Health Plan") by causing it to pay grossly excessive reimbursement rates for Defendants' prescription drugs to medical and pharmaceutical providers.

**Exhibit A**

CIRCUIT COURT LAFAYETTE COUNTY, MS

CERTIFIED COPY
CIRCUIT CLERK, LAFAYETTE COUNTY
by Albert-fe
8/28/09

2.      Fair and honest drug pricing is a matter of great importance to Mississippi and its citizens. Expenditures by Mississippi and its agencies for prescription drug reimbursement have increased dramatically in the past several years as a result, in part, of Defendants' fraudulent pricing scheme.  In the past year alone, the State Health Plan spent over $98 million on prescription drugs.  Since 1990, Defendants' pricing scheme has contributed to a health care funding crisis in Mississippi, and Defendants must be held to account for their role in that crisis.

3.      Mississippi has limited financial resources and is obligated to pursue any party whose unlawful conduct has diminished those limited funds.  Consequently, Mississippi, by and through its Attorney General, brings this action to recover amounts overpaid for prescription drugs under the State Health Plan as a result of the fraudulent and willful conduct of Defendants. Mississippi further seeks (1) to prohibit Defendants from continuing to perpetrate their drug-pricing scheme, (2) to require Defendants to publicly disclose true drug prices, and (3) to require Defendants to account for and disgorge all profits obtained by their improper and unlawful actions.

4.      Mississippi seeks redress for the fraudulent and willful marketing and pricing conduct of Defendants, who have profited from their wrongful acts and practices at the expense of Mississippi and its citizens.

PARTIES

5.      This action is brought for and on behalf of the sovereign State of Mississippi and its State Health Plan, by and through Jim Hood, the duly elected and current Attorney General of the State of Mississippi, pursuant to, *inter alia*, Miss. Code Ann. § 7-5-1 and the common law

2

and statutory authority of the Attorney General to represent the State of Mississippi and the State Health Plan.

6.      Defendant Sanofi-Aventis, f/k/a Aventis Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Sanofi-Aventis's principal place of business is located at 55 Corporate Boulevard, Bridgewater, NJ 08807. Sanofi-Aventis was created as a result of a merger between Aventis Pharmaceuticals and Sanofi-Synthelabo in August 2004 and is successor in interest to Hoechst Marion Roiussel, Inc.

7.      Defendant Hoechst Marion Roiussel, Inc. ("Hoechst"), is a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, MO.

8.      Defendant Dermik Laboratories, Inc. ("Dermik"), a wholly owned subsidiary of Aventis Pharm, is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals. Dermik's principal place of business is located at 1050 Westlakes Drive, Berwyn, PA 19312.

9.      Defendant Aventis Behring L.L.C. ("Aventis Behring") is an Illinois limited liability company with its principal place of business located at 1020 First Avenue, King of Prussia, PA. Aventis Behring LLC is the successor-in-interest to Centeon, LLC and Armour Pharmaceuticals.

10.     Defendant ZLB Behring L.L.C. ("ZLB Behring") is an Illinois limited liability company with its principal place of business located at 1201 North Kinzie Avenue, Bradley, Illinois 60915.

3

11.     Defendant CSL Behring L.L.C ("CSL Behring") is the successor in interest to ZLB Behring L.L.C. and is an Illinois limited liability company with its principal place of business located at 1201 North Kinzie Avenue, Bradley, Illinois 60915.

12.     Defendants are referred to collectively herein as either "Aventis" or "Defendants."

13.     At all times material to this civil action, Defendants transacted business in the State of Mississippi by, including but not limited to, marketing, selling and distributing to purchasers like the State of Mississippi, through the State Health Plan, the pharmaceutical products that are the subject of this action.  Upon information and belief, Pharmaceuticals unlawfully marketed and/or sold by Defendants and reimbursed by the Department of Finance and Administration pursuant to the State Health Plan are identified in Exhibit A, attached hereto.   Plaintiff reserves the right to supplement or otherwise modify this list of subject drugs following the close of discovery.

JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to Miss. Code Ann. § 9-7-81 and Section 156 of the Mississippi Constitution. In addition, all the claims asserted herein arise exclusively under Mississippi statutory or common law.

15.     This Court has personal jurisdiction over Defendants they conduct business in Mississippi, purposefully direct or directed their actions toward Mississippi, and/or have the requisite minimum contacts with Mississippi necessary to constitutionally permit the Court to exercise jurisdiction.

4

16.    Venue is proper pursuant to Miss. Code Ann. § 11-11-3 due to the fact that substantial alleged acts of Defendants which caused injury to Mississippi and its citizens occurred in Lafayette County; a substantial number of Lafayette County residents are participants in the State Health Plan; and the State Health Plan paid for affected drugs distributed in Lafayette County.

## FACTUAL BACKGROUND

17.    The State Health Plan is a self-insured health insurance plan which pays for claims and expenses associated with providing Mississippi's current State employees, retirees, and their dependents with health care coverage.    As provided by Mississippi state law, the State and School Employees' Health Insurance Management Board has complete authority to control, operate, and manage the State Health Plan.    The Department of Finance and Administration, Office of Insurance is authorized by law to provide day-to-day management of the State Health Plan.    Throughout this complaint, reference to the State Health Plan should be construed as reference to the Department of Finance and Administration where appropriate.

18.    The State Health Plan provides, among other benefits, prescription drug benefits to plan participants.    The State Health Plan currently provides health care coverage to approximately 195,000 individuals.    Since 1998, the cumulative annual cost of pharmacy-dispensed prescription drugs to the State Health Plan is approximately $864 million dollars.

19.    The State Health Plan reimburses medical providers, including physicians and pharmacists, for drugs prescribed and dispensed to plan participants pursuant to statutory and administrative formulas.    The State Health Plan utilizes a pharmaceutical benefits manager (PBM) to administer its prescription drug benefits.    From 1997 through 2005, the State Health

5

Plan's PBM was Caremark/Advance PCS. Since that time, the State Health Plan's PBM has been Catalyst Rx.

20. Reimbursement for pharmacy-dispensed prescription drugs under the State Health Plan is based on pricing information supplied by pharmaceutical manufacturers, such as Defendants, to pharmaceutical industry reporting services. This information includes the following price indices: (i) Average Wholesale Price ("AWP"), which is commonly understood as the average price charged by wholesalers to retailers, such as hospitals, doctors and pharmacies, for prescription drugs; (ii) Wholesale Acquisition Cost ("WAC"), which is commonly understood as the average price paid by wholesalers to the manufacturers for prescription drugs; and (iii) on occasion (prior to 2003), Direct Price, which is commonly understood as the price charged by drug manufacturers to non-wholesaler customers for prescription drugs. At all times relevant to this action, Defendants were aware of the State Health Plan's reimbursement formulas and procedures for pharmacy-dispensed drugs and/or the formulas and procedures of other third-party payors which utilize PBMs for their self-insured prescription drug benefits.

21. Defendants knowingly, willfully, wantonly, and/or intentionally provided, or caused to be provided, false and inflated AWP, WAC, and/or Direct Price information for their drugs to various nationally-known drug industry reporting services, including First DataBank (a/k/a Blue Book), Medical Economics, Inc. (a/k/a Red Book), and Medispan (collectively referred to herein as the "Reporting Services"). The Reporting Services published the pricing information to various reimbursers, such as the State Health Plan and/or its PBM, that subscribed to receive the pricing information (either in electronic or hard copy form). The pharmaceutical

6

manufacturers (including Defendants) and the Reporting Services knew that the subscribing reimbursers (including the State Health Plan and/or its PBM) used the pricing information as a basis to determine the amount of reimbursements to medical and pharmaceutical providers who had supplied pharmaceuticals to insureds and plan participants.

22.     The pricing information published was and is used by the State Health Plan in its reimbursement formulas with respect to reimbursement for pharmacy-dispensed drugs. At all relevant times to this action, the State Health Plan relied upon the AWP, WAC, and/or Direct Price provided by Defendants to the Reporting Services to determine the amount medical and pharmaceutical providers would be reimbursed pursuant to the State Health Plan's reimbursement formulas.

23.     Defendants knew the false and deceptive inflation of AWP, WAC, and/or Direct Price for their drugs would cause the State Health Plan to pay excessive amounts for these drugs. Defendants' inflated AWPs, WACs, and/or Direct Prices greatly exceeded the actual prices at which they sold their drugs to retailers (physicians, hospitals, and pharmacies) and wholesalers. Defendants' reported AWPs, WACs, and/or Direct Prices were false and misleading and bore no relation to any actual price, wholesale or otherwise.

24.     Defendants knowingly, willfully, wantonly, and/or intentionally concealed the true AWP, WAC, and/or Direct Price information of their drugs from the State Health Plan. As the suppliers of the pricing information provided to the Reporting Services, Defendants unquestionably know the AWP, WAC, and Direct Price published by the Reporting Services for use by the State Health Plan. Defendants also know whether the prices they supply to the Reporting Services accurately and truthfully represent the actual prices as reflected by market

7

experience and conditions. The State Health Plan is at an informational disadvantage, however, because unless governmental or industry surveys, lawsuits, or criminal or regulatory investigations publicly reveal the true AWP, WAC, and/or Direct Price for a particular drug, the State Health Plan has no basis upon which it can judge the accuracy of the price published by the Reporting Services. For years Defendants have hidden true market pricing information from reimbursers such as the State Health Plan so that the fraudulent scheme described herein would not be discovered.

25.     Defendants provided their customers with undisclosed discounts, rebates and other inducements, all of which had the effect of surreptitiously lowering the wholesale or sales prices that their customers actually paid. Defendants did not account for those price-reducing factors when they supplied pricing information to the Reporting Services. Accordingly, the actual wholesale or sales prices paid by their customers were much lower than the reported AWP, WAC, and/or Direct Price. In addition, Defendants employed secret agreements to conceal the lowest prices charged for their pharmaceutical products. As a result of these concealed inducements, Defendants prevented third parties, including the State Health Plan, from determining the true prices Defendants' customers paid.

26.     Aventis engaged in an organization-wide and deliberate scheme to inflate AWPs. In doing so, Aventis stated fraudulent AWPs for all or almost all of its drugs, including those set forth below:

8

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| AVENTIS | Allegra | fexofenadine | Antihistamine<br>Used for the relief of symptoms of seasonal allergic rhinitis |
| | Allegra-D | fexofenadine pseudoephedrine | Antihistamine<br>Used for the relief of symptoms of seasonal allergic rhinitis |
| | Amaryl | glimepiride | Antidiabetic<br>Used to lower blood glucose in Type II diabetes patients |
| | Anzemet | dolasetron mesylate | Antineoplastic<br>Used to prevent nausea and vomiting after chemotherapy or operation |
| | Arava | leflunomide | Antirheumatic<br>Used in the treatment of active rheumatoid arthritis |
| | Azmacort | triamcinolone aceonide (inh) | Steroidal Anti-Inflammatory Agent (Respiratory Agent)<br>Used for maintenance treatment of asthma |
| | Calcimar | calcitonin salmon | Parathyroid Agent<br>Used in the treatment of blood calcium levels and to increase the level of calcium in the bones |
| | Carafate | sucralfate | Duodenal Ulcer Adherent Complex (Gastrointestinal Agent)<br>Used in the treatment and maintenance therapy of duodenal ulcer |
| | Cardizem | diltiazem | Calcium Channel Blocker (Cardiovascular Agent)<br>Used in the treatment of angina and hypertension |
| | Gammar PI.V. | immune globulin | Immunizing Agent<br>Used as a maintenance therapy in patients with compromised immune systems |
| | Intal | cromolyn sodium | Antiasthmatic<br>Used to treat allergic rhinitis and severe perennial bronchial asthma |
| | Nasacort | triamcinolone acetonide (nasal) | Steriodal Anti-Inflammatory Agent (Nasal Preparation)<br>Used for nasal treatment of allergic rhinitis symptoms |

9

| Manufacturer | Brand Name (if applicable) | Generic Name | Therapeutic Category/Usage |
|---|---|---|---|
| | Taxotere | docetaxel | Antineoplastic<br>Used in the treatment of breast or lung cancer after failed chemotherapy |
| | Trental | pentoxifylline | Blood Viscosity-Reducing Agent (Blood Modifier)<br>Used to improve the flow of blood through blood vessels |

27.    In connection with its scheme to inflate AWPs, Aventis has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Commerce Committee of the U.S. House of Representatives, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

28.    Internal documents recently produced by Aventis in other litigation reveal the definition of AWP used and understood by Aventis and its predecessor companies. Specifically, a November 1992 internal newsletter at Armour Pharmaceutical Company (a predecessor company to Centeon LLC, later known as Aventis Behring) states:

> "AWP" is common language among insurance carriers (state, federal and private). The acronym stands for Average Wholesale Price. AWPs are set by manufacturers as a "suggested retail" for the products they produce. ***These figures represent a reasonable profit margin to healthcare providers and as such are widely referenced by insurance carriers when setting reasonable and customary rates of reimbursement.***
>
> Average Wholesale Prices are printed in Red Book Drug Topics and Blue Book. Both serve as data resources to all state Medicaid programs. Each publication lists the drugs by brand name in alphabetical order with its corresponding descriptions.

(emphasis added).

10

29.   Aventis also possessed the *Red Book*'s definition of Average Wholesale Price:

> Average wholesale price (AWP) is the standardized cost of a drug, which managed care plans frequently use for determining drug benefits. The AWP is determined through reference to a common source of price information, such as the American Druggist's *Blue Book*, which lists the costs charged for an undiscounted drug to a pharmacy by a large group of pharmaceutical wholesale suppliers. AWP's are set by pharmaceutical manufacturers and supplied to all pricing data banks for publication.

30.   Aventis increased the AWPs for its pharmaceutical products through direct communications with industry compendia during the Class Period.

31.   For example, on December 29, 1997, Rhone-Poulenc Rorer (a subsidiary of Rhone Poulenc SA, which merged with Hoechst AG to form Aventis in 1999) submitted a list of AWP price increases effective January 1, 1998 to both Medi-Span and First Data Bank. Aventis instructed Medi-Span and First Data Bank to "change [their] records accordingly to reflect the new prices." Similar letters requesting price changes for 1999 were sent to Medi-Span and First Data Bank by Aventis on December 29, 1998, and requesting price changes for 1997 on December 23, 1996.

32.   An April 1, 1998 letter from Centeon notifies Medical Economics (the *Red Book*) that effective April 1, 1998, it "has raised AWP pricing" for Bioclate and Monoclate.

33.   The purpose of Aventis' manipulation was to increase the spread in order to maximize the profit to providers and other intermediaries at the expense of Plaintiff and other third party payors of prescription drugs.

11

34.   Aventis knew that AWP manipulation, and the related marketing of an AWP spread, was improper.   An internal Aventis (Centeon) document, in pertinent part, states – in large, bold print:

## ATTENTION!

## SELLING AGAINST AWP

This is <u>not</u> an option.

Traditionally, some manufacturers have promoted differences in AWPs as a means to sell their products.  Centeon does not do this, and we hope to hear from you if you learn that any other manufacturer (sic) are using this tactic.

Some pharmaceutical manufacturers set high AWPs as a means of securing market shares for their drugs.  Although not illegal, the intensity of government scrutiny of this and other pharmaceutical manufacturer pricing practices is increasing.  The inspector general is looking at prices for big-ticket drugs

***

At the risk of being redundant it is imperative to stress that AWP can not (sic) be used in the content of selling any of our products. If you are made aware, either orally or through written correspondence, of an1y manufacturer using this form of sales tactic immediately report such findings to Gene Hull and appropriate steps will be taken.

35.   Nonetheless, Aventis (Centeon) routinely promoted differences in AWPs in marketing its numerous products.  In seminar materials used in conjunction with an "Oncology University Anzemet Workshop" held in 1998, Aventis explained to attendees how its AWP spread could be exploited.  Aventis offered the following definition and example of AWP spread:

**SPREAD**

- Difference between acquisition cost (AC) and reimbursement (Profit, Margin, etc.).

- Example for Anzemet

  -AC = $68 for 100 mg vial
  -AWP = $166.50
  -AWP – 5% = $158.18
  -80/20 = $126.54/$31.64
  -Spread = $58.54 + $31.64 = $90.18

36.     Aventis, through its employees and agents, also provided free samples of its drugs to providers. The free samples would be used to offset the total cost associated with purchases of its drugs, thereby increasing the spread, while also concealing the actual cost of the drug from third party payors like Plaintiff. In fact, a 1995 "SALES AND FREE GOODS STATUS" memo reveals that Aventis (Armour) issued millions of "free goods units" to a single customer alone.

37.     In a report published by the DHHS (AB-00-86), the DOJ documented at least 15 instances where the published AWPs for various dosages of 4 drugs manufactured by Aventis were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the 4 drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Aventis in the 2001 *Red Book*.

| Drug | 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Anzemet Injectable (dolasetron mesylate) | $166.50 | $74.08 | $92.42 | 125% |

13

| Drug | 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|---------------------|---------------------------|------------|-------------------|
| Factor VIII/ Bioclate | $1.25 | $.91 | $.34 | 37% |
| Factor VIII/ Helixate | $1.18 | $.78 | $.40 | 51% |
| Gammar (immune globulin) | $400.00 | $296.67 | $103.33 | 35% |

38.    An OIG report (*see* "Medicare Reimbursement of Prescription Drugs," OEI-03-00-00310, Jan. 2001) further revealed that:  (i) the AWP for all immune globulin 5 mg doses listed in the 1997 *Red Book* were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg dose of Taxotere had a Medicare Median of $283.65 and a Catalog Median of $8.29, resulting in a spread of 18.75%.

39.    Aventis distributed a "Reimbursement Spreadsheet" to be utilized by its sales personnel to demonstrate to "private practice office" customers the "financial advantages" of its drug, Anzemet, compared to Zofran and Kytril based on Aventis' established AWP and acquisition price.  Aventis also communicated to its sales staff on December 7, 1998 that "Anzemet still [held] the advantage on spread" following a Kytril price increase.

40.    Another Aventis internal document addresses how a particular Aventis customer might increase its margin choosing Anzemet over the competition

> Cost and Reimbursement: OnCare has negotiated a very favorable contract with Hoechst Marion Roussel [an Aventis predecessor company], manufacturer of Anzemet.  Our cost from OTN for the Anzemet 100 mg/ml vial is reduced from approximately $70 ea. to $62.50.  In addition there will be quarterly rebates further reducing the cost to $61.25.  The AWP is $149.88, making the margin $88.63.  Additional returns can be realized by using 1.8 mg/kg as recommended in the package insert.  For example, for a patient weighing 70Kg, the dose is 126 mg, requiring 2 vials.  Since the vial is single use, you may bill for both vials:  total cost is $122.50,

14

> the AWP is $299.76, the net is $177.26 (assuming reimbursement at AWP). By comparison the current margin for 0.7 of Kytril is $54.89. For 1 mg it is $78.42. If there is a price increase in 1999 (which we expect) our prices are protected, however the AWP will go up, further increasing the margin. The contract makes Anzemet the preferred 5-HT3 antiemetic drug for OnCare.

41.     Other customers received promotional materials reflecting a significant spread between the unit price and AWP for Anzemet – and touting a "Reimbursement and Patient Assistance Program Hotline."

42.     A government investigation revealed similar inflated pricing implemented by Aventis with respect to the injectable form of Anzemet. In a September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, U.S. Rep. Pete Stark provided a synopsis of the scheme implemented by Aventis (Hoechst):

> The following chart represents a comparison of Hoechst's fraudulent price representations for its injectable form of the drug versus the truthful prices paid by the industry insider. It is [sic] also compares Hoechst's price representations for the tablet form of Anzemet and the insider's true prices. It is extremely interesting that Hoechst did not create a spread for its tablet form of Anzemet but only the injectable form. This is because Medicare reimburses Doctors for the injectable form of this drug and by giving them a profit, can influence prescribing. The tablet form is dispensed by pharmacists, who accept the Doctor's order. And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs and underscores the fact that, if we cannot rely upon the drug companies to make honest and truthful representations of their prices, Congress will be left with no alternative other than to legislate price controls.

15

| NDC No: | Unit Size/ Type | Quantity | Net Price as Represented to Florida Medicaid | True Wholesale Price | Variance |
|---|---|---|---|---|---|
| 0088-1206-32 | 100 mg/5 ml Injectable | 1 | $124.90 | $70.00 | Represented price 78% higher than true wholesale price. |

43.     Similarly, Aventis increased AWPs for its Gammar product line to keep provider and intermediary reimbursement levels competitive with those created by the inflated AWPs of other manufacturers.    A May 8, 1996 Aventis (Centeon) Interoffice Correspondence memo states:

> Effective June 1, 1996, we will be revising our AVERAGE WHOLESALE PRICE for our Gammar P iv product line.  We are implementing this change based on feedback from the field.  Alpha and Bayer have recently increased their AWP pricing on Gammimmune 10% and Venoglobulin S 10%.  They are presently priced at $75 and $80 per gram respectively. . . .  This change will help us maintain a competitive balance in the marketplace.

44.     Centeon interoffice correspondence, dated June 23, 1999, reveals that a Centeon employee provided a representative of First Data Bank with the following information regarding Centeon's AWP for Gammar:

> She asked me to validate Centeon's AWP and wholesale list price for Gammar PIV 5 and 10 gram vials.
>
> ***
>
> I gave her the following info:
>
> "Currently it is not Centeon's business practice to sell Gammar PIV to wholesalers.  But should a wholesaler place an order, our wholesale list price is $52/gram, or $260 for 5 gram vial, and $520 for 10 gram vial."

16

> "Centeon's suggested AWP is $400 for 5 gram vial, and $800 for 10 gram vial. This is pricing as reported to First Data Bank, but we do not sell product at these prices."

45.     U.S. Rep. Thomas J. Bliley, in a May 4, 2000 letter to the CEO of Aventis (Behring), also stated concerns regarding Aventis' pricing of Gammar:

> The Office of Inspector General (OIG) at the Department of Health and Human Services determined that the Medicare-allowed amount for immune globulin, a pharmaceutical product sold by your company under the name Gammar, in Fiscal Year 1996 was $42.21. The OIG further estimated that the actual wholesale price of this drug was $16.12 and the highest available wholesale price that the OIG was able to identify was $32.11.

46.     In response to government subpoenas, Aventis produced numerous price lists setting forth spreads between AWPs and prices offered to wholesalers, providers and other intermediaries. Publicly available information regarding those price lists indicates that Aventis consistently offered drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.

47.     For example, a March 4, 1997 price list issued by Arcola Laboratories (a division of Rhonel-Poulenc Rorer Pharmaceuticals) sets the AWP for Calcimar (calcitonin-salmon) at $31.35, with a cost of $12.00 – for a spread of 161%.

48.     Furthermore, Aventis sales representatives were instructed to 1) understand the similarities and differences between Aventis Group drugs and competing products, 2) compute the reimbursement amounts for all the competing products, 3) discern whether the sales target was sensitive to reimbursement-based incentives and if so, 4) induce the sales target to

17

purchase the Aventis Group product over its competitors' product based on the benefits of Aventis Group reimbursement.

49.     When Aventis products had the largest spread, sales representatives were provided spread comparisons of all competing drugs, and informed that reimbursement would likely determine drug selection.

50.     Aventis marketed the spread, even when it was equal to its competitors.  Under such circumstances, Aventis sales representatives were instructed to explain that Aventis' lower AWP meant that drug purchasers had to "invest" less money to get the same spread, granting the providers a greater return on investment ("ROI"). Specifically, Aventis representatives were instructed to highlight that where two products have the same spread (e.g. $50) the greater ROI is associated with the lower priced product. For example,

| Product 1 | | Product 2 | |
|---|---|---|---|
| AWP = | $100 | AWP = | $90 |
| Acquisition Cost = | $50 | Acquisition Cost = | $40 |
| Spread= | $50 | Spread = | $50 |

51.     With product 1, the provider has to pay $50 to make $50, or a 100% ROI. With Product 2, the provider has to pay only $40 to make $50, or to get 125% ROI. In addition, Aventis' sales representatives were instructed to highlight the lower opportunity cost of purchasing Aventis drugs.

52.     In connection with the wrongful conduct described herein Aventis has been investigated by at least the United States Department of Justice, the United States Congress, the Office of Inspector General of the Department of Health and Human Services, the

18

Attorneys General for the States of California, Florida, Illinois, Montana, Pennsylvania, Texas and Wisconsin, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

53.     Aventis deliberately acted to conceal its fraudulent reporting and marketing of the AWP spread. For example, in response to a May 26, 1995 fax request from *Red Book*, Aventis refused to provide Wholesale Acquisition Cost (WAC) for products it listed in the *Red Book* database – in spite of *Red Book's* assurances that WAC information would be distributed via electronic means only. Aventis effectively hid the AWP spread from Mississippi and its State Health Plan.

54.     Aventis also is the subject of the investigation led by Senators Grassley and Baucus of the Senate Finance Committee regarding whether it is abusing the nominal price exception to the Best Price reporting requirements. On information and belief, Aventis Group routinely offers its products to commercial customers for prices less than 10% AWP and (a) does not account for these sales in its calculation of WAC or AWP and (b) does not account for these deeply discounted sales in its calculation of Best Price. Various details of these investigations have been disclosed in Aventis' SEC filings.

55.     Sanofi's form 20-F for the year 2004 discloses that the U.S. Attorney's office in Boston expanded its investigation to the topic of whether Aventis "directly or indirectly made payments to customers or to those in a position to influence sales of [Aventis] pharmaceuticals in order to obtain or keep drug business and to evade Medicaid best price reporting requirements." The U.S. Attorney served Sanofi-Aventis with a subpoena demanding "documents related to [Sanofi's-Aventis's] interactions with and payments to managed care customers, formulary

placement, sales and marketing of specific products to those managed care customers, as well as contracts with wholesalers and distributors and payments to non-Aventis employees."

56.     The U.S. Attorney's Office in Chicago is conducting a civil and criminal investigation with regard to Aventis' Lovenox sales and marketing practices from January 1, 1999 to the present. *Id.* (Lovenox is among the drugs at issue in this complaint.)

57.     There are several ongoing investigations into Aventis's reporting of AWP for certain products. Sanofi's 2004 20-F stated that:

> The Department of Justice is reviewing the merits of a qui tam action filed in 1995 in federal court in Florida, which alleges that the Average Wholesale Prices ("AWP") of certain pharmaceutical products, which are used to set Medicare reimbursement levels, were improperly established and used by API, Aventis Behring, and Armour Pharmaceutical Company in the marketing of their products. API and Aventis Behring also received subpoenas from the states of California and Texas with respect to such issues in 2000. API received a similar subpoena from the state of Massachusetts in April 2001.

58.     In 2002, Aventis disclosed that "U.S. Centers for Medicare & Medicaid Services ("CMS") has indicated that it will seek repayment of amounts it alleges should have been included in rebates paid by [Aventis] to the various states as part of the Medicaid program. CMS claims that sales of certain products to managed care organizations for distribution by such organizations should have been included in [Aventis] 's "best price" calculations, which are used to compute the rebates." Aventis 20-F (For the fiscal year ended December 31, 2002).

59.     Aventis has been sued by numerous States and other payors for prescription drugs for the illegal conduct described herein.  Aventis has settled some of these claims, including a class action by third party payors pending in the District

20

of Massachusetts. The State Health Plan timely opted out of this settlement and files this suit to recover its damages from Aventis' illegal conduct.

60. As set forth above, Aventis' scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by Mississippi and its State Health Plan.

## CAUSES OF ACTION

61. The State of Mississippi asserts only state law claims in this Complaint and makes no claims herein under the United States Constitution or any federal law. Additionally, none of the claims at issue are subject to federal preemption.

### Count One
### False Advertising

62. Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

63. Defendants violated Mississippi's statutory prohibition on false advertising. Specifically, Defendants violated Miss. Code Ann. § 97-23-1 by misrepresenting the true nature of their business by representing to the Reporting Services and other media that they sold their products at particular prices (e.g., AWPs, WACs, and/or Direct Prices) that were false, inflated, and intentionally misleading.

64. Further, Defendants violated Miss. Code Ann. § 97-23-3 by intentionally and knowingly making, publishing, disseminating, circulating or placing before the public AWPs, WACs, and/or Direct Prices for their products which were untrue, deceptive and misleading due to their inflated and exorbitant nature.

21

65.     Defendants' violations of the above laws caused Mississippi and its State Health Plan to incur substantial damages in the form of overpayments for prescription drugs.

## Count Two
## Crimes Against Sovereignty

66.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

67.     Defendants violated Miss. Code Ann. § 97-7-10.     Specifically, Defendants defrauded the State of Mississippi, including the State Health Plan, by knowingly and willfully falsifying the AWPs, WACs, and/or Direct Prices of their products in documents relied on by Mississippi and the State Health Plan in paying claims, as well as concealing or covering up their scheme to falsify their AWPs, WACs, and/or Direct Prices and market the "spread" on their products.

68.     Defendants' violations of the above laws caused Mississippi and its State Health Plan to incur substantial damages in the form of overpayments for prescription drugs.

## Count Three
## Intentional Misrepresentation

69.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

70.     Defendants have violated Mississippi's laws against intentional misrepresentation.

71.     Defendants misrepresented the AWP, WACs, and/or Direct Prices of their products, knowing that these misrepresentations were both false and material.

22

72.     Defendants' intent was that Mississippi, its State Health Plan, and other third-party payors rely upon the misrepresentations in calculating reimbursements and/or payments that involved AWP, WAC or Direct Price.

73.     Mississippi and its State Health Plan had no knowledge of the falsity of Defendants' misrepresentations regarding AWP, WAC or Direct Price.

74.     Mississippi and its State Health Plan had the right to rely upon Defendants' misrepresentations in calculating reimbursements and/or payments for Defendants' products and did in fact so rely.

75.     By engaging in the acts and practices described above, Defendants have engaged and continue to engage in repeated acts of intentional misrepresentation in violation of Mississippi common law.

76.     Defendants' conduct was and is knowing, intentional, gross, oppressive, malicious, wanton, and/or committed with the intention to cause injury.

77.     Defendants' intentional misrepresentation caused Mississippi and its State Health Plan to incur substantial damages in the form of overpayments for prescription drugs.

Count Four<br>Negligent Misrepresentation

78.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

79.     Defendants have violated Mississippi's laws against negligent misrepresentation.

80.     Defendants misrepresented the AWP, WACs, and/or Direct Prices of their products.

23

81.     Defendants' misrepresentations regarding AWPs, WACs, and/or Direct Prices were both material and significant.

82.     Through these misrepresentations Defendants failed to exercise that degree of diligence and expertise the public is entitled to expect.

83.     Mississippi and its State Health Plan reasonably relied upon Defendants' misrepresentations in calculating reimbursements and/or payments for Defendants' products.

84.     Mississippi and its State Health Plan suffered damages in the form of over overpayments for affected drugs as a direct and proximate result of its reasonable reliance on Defendants' misrepresentations.

## Count Five
### Tortious Interference With a Business Relationship

85.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

86.     Defendants' wrongful acts described above were intentional and willful.

87.     Defendants' wrongful acts described above were calculated to cause damage to Mississippi and its State Health Plan, among other third party payors, in the course of their lawful business.

88.     Defendants' wrongful acts described above were undertaken with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the Defendants.

89.     The State Health Plan was damaged and loss resulted as a direct and proximate result of Defendants' wrongful acts.

24

<u>Count Six</u>
<u>Common Law Fraud</u>

90.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

91.     Defendants committed common law fraud against Mississippi and the State Health Plan.  Defendants reported or caused to be reported pricing information (e.g., AWPs, WACs, and/or Direct Prices) for their products on a periodic and continuing basis for publication and dissemination to Mississippi and its agencies.  Defendants knew that the pricing information which they reported or caused to be reported was false.  Defendants misrepresented the pricing information with the intent of inducing the State Health Plan and other third party payors to rely on the false information in setting prescription drug reimbursement rates.  The State Health Plan reasonably relied on the false pricing data in setting prescription drug reimbursement rates and making payment based on said rates.  Defendants' misrepresentations are continuing, as they regularly and periodically continue to issue false and inflated pricing information for publication.  As a result of Defendants' fraudulent conduct, Mississippi has been damaged by paying grossly excessive amounts for Defendants' prescription drugs.

92.     By engaging in acts and practices described above, Defendants have engaged and continue to engage in repeated fraudulent acts and practices in violation of Mississippi common law.

93.     Defendants' conduct was and is knowing, intentional, gross, oppressive, malicious, wanton, and/or committed with the intention to cause injury.

94.     The State Health Plan was damaged and loss resulted as a direct a proximate result of Defendants' fraudulent conduct.

Count Seven<br>Unjust Enrichment

95.     Mississippi hereby repeats, incorporates by reference, and realleges each and every allegation set forth above in this Complaint.

96.     As a result of the false and misleading statements and representations regarding the reporting of Defendants' drug pricing information to the Reporting Services, Mississippi and its State Health Plan has paid excessive amounts in connection with purchases or reimbursements of purchases of Defendants' prescription drugs.

97.     Defendants knew that medical and pharmaceutical providers who obtained reimbursements for Defendants' drug products were not entitled to improperly inflated reimbursement rates that were based on Defendants' false pricing information that was supplied to the Reporting Services.

98.     As a result of the excessive payments to medical and pharmaceutical providers by the State Health Plan of all or part of the "spread" as explained above, Defendants obtained increased sales and market share for their products, and, therefore, increased profits, and were unjustly enriched at the expense of Mississippi and the State Health Plan.

99.     Defendants knew they were not entitled to the profits that resulted from the sales obtained through the use of the spreads they created, and Defendants should be required to account for and make restitution to Mississippi of all such amounts obtained through the use of such spreads.

26

<u>Prayer for Relief</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff, the State of Mississippi, by and through Jim Hood, its duly elected Attorney General, requests that this Court grant the following relief against Defendants as follows:

(1)     an award of compensatory damages to Mississippi in such amount as is proved at trial;

(2)     an award of punitive damages;

(3)     an accounting of all profits or gains derived in whole or in part by each Defendant through its fraudulent, unfair and/or deceptive acts or practices complained of herein;

(4)     a constructive trust of the moneys illegally and impermissibly obtained from Defendants' scheme;

(5)     an order imposing a constructive trust on and/or requiring disgorgement by each Defendant of all profits and gains earned in whole or in part through the fraudulent, unfair and/or deceptive acts or practices complained of herein;

(6)     an award of costs and prejudgment interest; and

(7)     such other and further relief as the Court may deem appropriate and just.

RESPECTFULLY SUBMITTED, this the 22nd day of July, 2009.

                                        JIM HOOD
                                        ATTORNEY GENERAL OF MISSISSIPPI

                                        BY: _____
                                        George W. Neville (MBN 3822)
                                        Special Assistant Attorney General

OF COUNSEL:

**McCULLEY McCLUER PLLC**
Stuart H. McCluer (MBN 101366)
R. Bryant McCulley (Pro Hac pending)
1109 Van Buren Avenue

27

Oxford, Mississippi 38655

**RICHARDSON PATRICK**
**WESTBROOK & BRICKMAN, LLC**
James L. Ward, Jr. (Pro Hac pending)
A. Hoyt Rowell, III (Pro Hac pending)
Robert S. Wood (Pro Hac pending)
P.O. Box 1007
Mt. Pleasant, SC 29465

**DAVID SHELTON PLLC**
David W. Shelton (MBN 99675)
P.O. Box 2541
120-A Courthouse Square
Oxford, Mississippi 38655

28

## IN THE CIRCUIT COURT OF LAFAYETTE COUNTY, MISSISSIPPI

THE STATE OF MISSISSIPPI,                                      PLAINTIFF,

V.                                                   CIVIL ACTION NO. L09-460

SANOFI-AVENTIS f/k/a/ AVENTIS
   PHARMACEUTICALS, INC.;
HOECHST MARION ROUSSEL;
DERMIK LABORATORIES, INC.;
AVENTIS BEHRING, L.L.C.;
ZLB BEHRING, L.L.C; and
CSL BEHRING, L.L.C.,                                       DEFENDANTS.



LAFAYETTE COUNTY
**FILED**
AUG 17 2009
Mary Alice Busby
CIRCUIT CLERK
BY _____ D.C.

---

### NOTICE OF FILING OF EXHIBIT "A" TO COMPLAINT

---

Plaintiff, the State of Mississippi, hereby files Exhibit "A" to the Complaint in this matter. Exhibit "A" to the Complaint was not attached to the Complaint when originally filed due to administrative error.

RESPECTFULLY SUBMITTED, this the 17th day of August, 2009.

JIM HOOD
ATTORNEY GENERAL OF MISSISSIPPI


BY: /s/ George W. Neville
    George W. Neville (MBN 3822)
    Special Assistant Attorney General


OF COUNSEL:

McCULLEY McCLUER PLLC
Stuart H. McCluer (MBN 101366)
R. Bryant McCulley (Pro Hac pending)

CIRCUIT COURT
LAFAYETTE COUNTY, MS

**CERTIFIED COPY**
CIRCUIT CLERK, LAFAYETTE COUNTY
by a Roberts DC
8/28/09

1

1109 Van Buren Avenue
Oxford, Mississippi 38655

**RICHARDSON PATRICK**
**WESTBROOK & BRICKMAN, LLC**
James L. Ward, Jr. (Pro Hac pending)
A. Hoyt Rowell, III (Pro Hac pending)
Robert S. Wood (Pro Hac pending)
P.O. Box 1007
Mt. Pleasant, SC 29465

**DAVID SHELTON PLLC**
David W. Shelton (MBN 99675)
P.O. Box 2541
120-A Courthouse Square
Oxford, Mississippi 38655

2

**EXHIBIT A**

| NDC | FDA Prod | Firm |
|---|---|---|
| 00075-7700-60 | RILUTEK 50 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2915-01 | LOVENOX 15 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2912-01 | LOVENOX 12 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2452-01 | DDAVP 0.01 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2452-01 | DDAVP RTS | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2451-53 | DDAVP INJ | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2451-53 | DDAVP INJE | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2450-01 | DDAVP RHIN | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2450-02 | DDAVP 0.1 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2450-02 | DDAVP NASA | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-2450-02 | DDAVP SPRA | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1506-16 | NASACORT 1 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1506-16 | NASACORT A | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1505-43 | NASACORT | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1505-43 | NASACORT N | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1306-01 | CALCIMAR | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-1306-01 | CALCIMAR S | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0850-84 | NITROLINGU | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0700-00 | LOZOL | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0624-30 | LOVENOX | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0624-30 | LOVENOX 30 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0623-00 | LOVENOX 10 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0622-80 | LOVENOX 80 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0621-60 | LOVENOX 60 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0620-40 | LOVENOX 40 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0300-00 | SLO-BID | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0252-00 | DILACOR, 2 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0251-00 | DILACOR, 1 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0250-00 | DILACOR XR | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0200-00 | SLO-BID | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0082-00 | LOZOL | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0082-99 | LOZOL | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0060-37 | AZMACORT | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0060-37 | AZMACORT I | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0026-00 | DDAVP 0.2 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0026-00 | DDAVP 0.2M | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00075-0016-00 | DDAVP 0.1 | AVENTIS PHARMACEUTICAL PRODUCTS I |
| 00088-2225-07 | KETEK PAK | AVENTIS PHARMACEUTICALS INC |
| 00088-2220-33 | LANTUS 10M | AVENTIS PHARMACEUTICALS INC |
| 00088-2220-33 | LANTUS 100 | AVENTIS PHARMACEUTICALS INC |
| 00088-2161-30 | ARAVA 20 M | AVENTIS PHARMACEUTICALS INC |
| 00088-2161-30 | ARAVA 20MG | AVENTIS PHARMACEUTICALS INC |
| 00088-2161-30 | ARAVA (LEF | AVENTIS PHARMACEUTICALS INC |

| | | |
|---|---|---|
| 00088-2160-30 | ARAVA 10MG | AVENTIS PHARMACEUTICALS INC |
| 00088-2160-30 | ARAVA (LEF | AVENTIS PHARMACEUTICALS INC |
| 00088-1799-42 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1798-30 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1798-42 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1797-30 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1797-42 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1796-30 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1796-42 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1795-30 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1795-42 | CARDIZEM C | AVENTIS PHARMACEUTICALS INC |
| 00088-1792-47 | CARDIZEM ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1791-47 | CARDIZEM ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1779-47 | CARDIZEM S | AVENTIS PHARMACEUTICALS INC |
| 00088-1778-47 | CARDIZEM S | AVENTIS PHARMACEUTICALS INC |
| 00088-1777-47 | CARDIZEM S | AVENTIS PHARMACEUTICALS INC |
| 00088-1772-47 | CARDIZEM ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1772-55 | CARDIZEM ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1771-47 | CARDIZEM ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1712-47 | CARAFATE ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1712-47 | CARAFATE 1 | AVENTIS PHARMACEUTICALS INC |
| 00088-1712-55 | CARAFATE ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1712-55 | CARAFATE 5 | AVENTIS PHARMACEUTICALS INC |
| 00088-1700-15 | CARAFATE 1 | AVENTIS PHARMACEUTICALS INC |
| 00088-1700-15 | CARAFATE ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1153-30 | COPAXONE 2 | AVENTIS PHARMACEUTICALS INC |
| 00088-1150-03 | COPAXONE ( | AVENTIS PHARMACEUTICALS INC |
| 00088-1109-47 | ALLEGRA (F | AVENTIS PHARMACEUTICALS INC |
| 00088-1109-47 | ALLEGRA 18 | AVENTIS PHARMACEUTICALS INC |
| 00088-1107-47 | ALLEGRA 60 | AVENTIS PHARMACEUTICALS INC |
| 00088-1106-47 | ALLEGRA 30 | AVENTIS PHARMACEUTICALS INC |
| 00088-1102-47 | ALLEGRA 60 | AVENTIS PHARMACEUTICALS INC |
| 00088-1102-47 | ALLEGRA (F | AVENTIS PHARMACEUTICALS INC |
| 00088-1090-47 | ALLEGRA-D | AVENTIS PHARMACEUTICALS INC |
| 00039-0223-10 | AMARYL 4 M | AVENTIS PHARMACEUTICALS NJ |
| 00039-0223-10 | AMARYL 4MG | AVENTIS PHARMACEUTICALS NJ |
| 00039-0222-10 | AMARYL 2 M | AVENTIS PHARMACEUTICALS NJ |
| 00039-0222-10 | AMARYL 2MG | AVENTIS PHARMACEUTICALS NJ |
| 00039-0106-10 | ALTACE (RA | AVENTIS PHARMACEUTICALS NJ |
| 00039-0105-10 | ALTACE (RA | AVENTIS PHARMACEUTICALS NJ |
| 00039-0104-10 | ALTACE (RA | AVENTIS PHARMACEUTICALS NJ |
| 00039-0078-10 | TRENTAL (P | AVENTIS PHARMACEUTICALS NJ |
| 00039-0078-11 | TRENTAL (P | AVENTIS PHARMACEUTICALS NJ |
| 00039-0052-10 | DIABETA (G | AVENTIS PHARMACEUTICALS NJ |
| 00039-0052-50 | DIABETA (G | AVENTIS PHARMACEUTICALS NJ |

| 00039-0052-70 | DIABETA (G | AVENTIS PHARMACEUTICALS NJ |
| 00039-0051-10 | DIABETA (G | AVENTIS PHARMACEUTICALS NJ |
| 00039-0009-30 | LOPROX (CI | AVENTIS PHARMACEUTICALS NJ |
| 00066-0510-23 | BENZAMYCIN | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-0510-46 | BENZAMYCIN | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-8008-01 | PENLAC NAI | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-8008-02 | PENLAC 8% | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-0494-25 | BENZACLIN | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-0494-50 | BENZACLIN | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-0272-60 | PSORCON E | DERMIK LABORATORIES DIV AVENTIS P |
| 00066-0071-60 | Psorcon Oi | DERMIK LABORATORIES DIV AVENTIS P |
| 00053-8130-01 | HELIXATE F | ZLB BEHRING LLC |
| 00053-8130-02 | HELIXATE F | ZLB BEHRING LLC |
| 00053-8130-04 | HELIXATE F | ZLB BEHRING LLC |
| 00053-8120-01 | HELIXATE 2 | ZLB BEHRING LLC |
| 00053-8120-02 | HELIXATE 5 | ZLB BEHRING LLC |
| 00053-8120-04 | HELIXATE 1 | ZLB BEHRING LLC |
| 00053-8110-01 | BIOCLATE | ZLB BEHRING LLC |
| 00053-8110-04 | BIOCLATE | ZLB BEHRING LLC |
| 00053-7656-01 | MONOCLATE- | ZLB BEHRING LLC |
| 00053-7656-04 | MONOCLATE- | ZLB BEHRING LLC |